IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA AND : | |
| THE STATE OF NEW YORK EX REL : | |
| LEONARD A. PELULLO : | CIVIL ACTION NO. 16-CV-5694 |
|     Plaintiffs and Relator : | |
| : | |
| v. : | |
| : | |
| AMERICAN INTERNATIONAL GROUP, INC. : | |
| STARR INTERNATIONAL CO, INC. : | |
| C.V. STARR & CO., INC. : | |
| MAURICE "HANK" GREENBERG : | |
| HOWARD I. SMITH AND MEL HARRIS : | |
|     Defendants : | |

**MEMORANDUM OF RELATOR LEONARD A. PELULLO AND JOSEPH M. FIORAVANTI, ESQUIRE IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SANCTIONS**

    Relator, Leonard A. Pelullo, and Joseph M. Fioravanti, Esquire (collectively "respondents") respectfully submit this memorandum in opposition to defendants' joint motion for sanctions. Respondents contend that there is no basis for sanctions against them, because:

    (1) The second amended complaint ("SAC") is objectively reasonable, because it states valid causes of action under the federal and New York False Claims Acts (sometimes referred to as "FCA");

    (2) Relator's declaration attached to this response as exhibit 1 demonstrates his strong factual basis for bringing actions against the defendants under the federal and New York False Claims Acts; and

    (3) Defendants fail to present any factual support for their Rule 11 motion, such as bills and declarations relating to the proper hourly rate for legal services.  Moreover, it would prejudice respondents for defendants to remedy this defect in a reply brief, because that would leave respondents without any opportunity to rebut defendants' factual assertions.

**I.      The claims and legal contentions in the SAC are warranted by existing law.**

Fed.R.Civ.P. 11(b) provides in relevant part:

By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . .

**(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

**(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

The following is a rebuttal of **each assertion** in defendants' memorandum concerning the validity of the SAC's legal contentions.

A.

Defendants claim that the SAC's legal contentions are baseless because they "fail[] to identify any specific false statement to secure a payment or to avoid an existing obligation." Defendants' Memorandum, at 6.  Defendants are incorrect.  The SAC identifies three (3) material false statements to secure payment from the government or to avoid an existing obligation.

*False Claim # 1: AIG deliberately failed to disclose material facts to federal and state government agencies in order to underpay billions in 2006 settlement (Count II of SAC).*  This is a reverse false claim under 31 U.S.C. § 3729(a)(1)(G), on which liability is premised on a "false statement[ ] designed to conceal, reduce, or avoid an obligation to pay money or property to the Government."  *Wood ex rel. United States v. Applied Res. Assocs., Inc.*, 328 Fed. Appx. 744, 748 (2d Cir. 2009).  To prove such a claim, the relator must show: "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing 'obligation' to

the government," *i.e.*, a "duty to pay money or property." *U.S. ex rel. Kester v. Novartis Pharmaceuticals Corp. (Novartis V)*, 43 F.Supp.3d 332, 367 (S.D.N.Y. 2014).

In 2004-05, federal and state agencies pursued civil actions against AIG relating for $6.5 billion dollars pertaining to improprieties in AIG's accounting, financial reporting and insurance brokerage practices and underpayment of taxes and assessments. SAC, ¶ 103. In February 2006, AIG entered into a settlement with the federal and state agencies in which AIG agreed (1) to pay $1.6 billion to the agencies, (2) restate its financials for previous years; (3) undergo a three-year review by an independent consultant for the purpose of instituting effective internal controls within AIG's regulatory structure, thus extending the statute of limitations by three years; (4) give the consultant full access to AIG's books and records; and (5) report any fraudulent or criminal conduct within its knowledge to federal and state prosecutors. SAC, ¶¶ 103-09.

In short, AIG promised to institute systemic financial reforms and report all previous wrongdoing during a three year compliance period ending in February 2009. It never did. Instead, AIG concealed multiple acts of wrongdoing committed in the years predating the settlement, thus demonstrating that its promise to report all past wrongdoing was a fraud. These prior acts of wrongdoing included (1) concealment of losses suffered by AIG's insurance underwriting business by fraudulently reporting underwriting losses relating to performance bonds issued to Fischbach Corporation as "investment losses," (2) facilitation of organized crime by underwriting insurance of organized crime-controlled entities in the construction and service industries through JBL Trinity, an organized crime-controlled insurance broker, and (3) concealment of millions of dollars in related party transactions to defendant Mel Harris. As a result of AIG's misrepresentations, AIG paid only $1.6 billion in the settlement and escaped paying an additional $4.9 billion. Had the government entities known of AIG's fraud, they

would not have agreed to settle and would have pursued damages of $6,556,553,522.00, billions more than the settlement amount. Had the government entities learned about this wrongdoing during the three year compliance period, they would have moved to vacate the settlement and reinstituted their civil actions against AIG. These frauds were never revealed in the settlement or thereafter, a classic reverse false claim. In the words of defendants' memorandum, the settlement constituted a "specific false statement" (Defendants' memorandum, at 6) designed to conceal prior frauds, and the failure to report these frauds during the three-year compliance period compounded the frauds concealed in this "specific false statement."

*False Claim # 2: submission of false financial statements to induce federal government to bail AIG out in 2008 with billions in TARP funding (Count III of SAC).* This is a false claim under 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). To prove a violation of the former, the relator must show that "(1) there was a false or fraudulent claim, (2) the defendant knew it was false or fraudulent; (3) the defendant presented the claim, or caused it to be presented, to the United States, and (4) it did so to seek payment from the federal treasury." *United States ex rel. Kester v. Novartis Pharma. Corp. (Novartis I)*, 23 F.Supp.3d 242, 252 (S.D.N.Y. 2014) (citing *Mikes*, 274 F.3d at 695). For the latter, a relator must show that "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Id.* This provision includes a "double falsity" requirement because a relator must allege both a false record *and* a false claim. Strictly speaking, only subsection (a)(1)(A) expressly requires that a claim be "paid or approved by the Government"; courts in this Circuit, however, generally agree that "plaintiffs asserting subsection (a)(1)(B) claims must likewise plead the 'claim' submission element with particularity." *Novartis I*, 23 F.Supp.3d at 252.

The SAC alleges this false claim with sufficient particularity. On November 25, 2008, as part of the bailout, the federal government purchased $40 billion in newly issued AIG preferred Series D shares under TARP. On April 17, 2009, the government purchased billions more of series F preferred stock from AIG. The agreements underlying both transactions represented that AIG's financial statements filed with the SEC since December 31, 2006, and all statements incorporated therein, were true and correct and complied with GAAP. This was false. AIG's year-end 2006 financial statement was false, because it failed to disclose the serious misconduct relating to Fischbach, JBL Trinity and Harris. Moreover, AIG's March 2007 10-K incorporated the February 2006 settlement, which, as discussed above, fraudulently concealed the same serious misconduct relating to Fischbach, JBL Trinity and Harris. Had the federal government known about this misconduct, it would never have bailed out AIG. To use defendants' language, the agreements underlying the TARP transaction included "specific false statements" that AIG's year-end 2006 financials were true and correct and complied with GAAP.

*False Claim # 3: AIG's submission of Recapitalization Plan in January 2011 (Count III of SAC).* Like False Claim # 2, this is a false claim under 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). On December 8, 2010, AIG and the federal government entered into a "Recapitalization Plan" which purportedly was intended to facilitate repayment of AIG's debt to the government and the government's sell-off of its control block of stock in AIG. Under the Recapitalization Plan, the government agreed to convert its preferred shares of AIG stock, including the Series D and F preferred shares, into a total of 92.1% of AIG's common stock, or approximately 1.7 billion shares. Through this conversion, the government relinquished its control over AIG. On or after January 14, 2011, the closing date of the Recapitalization Plan, the government converted its control block of preferred shares into 92.1% of AIG common stock.

Beginning on May 11, 2011, the government commenced a series of sales of AIG common stock. At least six such sales took place, the last of which was on December 12, 2012.

In order for the government to convert the series D and F preferred shares to common stock in the Recapitalization Plan, it had to believe that AIG's representation of its financial condition in its year-end 2006 financial statement, and subsequent financial statements, was truthful. SAC, ¶ 129. As discussed above, AIG's year-end 2006 financial statements concealed material falsehoods about AIG's financial condition. Had the federal government known of these falsehoods, it would never have agreed to relinquish its control over AIG. Instead, it would have taken over AIG and would have either operated AIG at a profit of billions of dollars or liquidated AIG at a profit of billions of dollars for the benefit of the United States taxpayers. The Recapitalization Plan was a false claim because it deceived the government into relinquishing its control over AIG. To use defendants' language, the Recapitalization Plan took place due to defendants' "specific false statement" that AIG's year-end 2006 financials were true and correct and complied with GAAP.

B.

Defendants claim that Relator "advanced the frivolous proposition that he somehow had the right to enforce the securities laws on behalf of the United States based on AIG's own internal compliance procedures." Defendants' Memorandum, at 6. This deliberately mischaracterizes the SAC. As discussed in section A above, Relator does nothing other than demonstrate that defendants made three (3) false claims designed either to conceal their fraud from government entities or to defraud the federal government into paying TARP monies or entering the Recapitalization Plan. Defendants suggest, without "citation to any applicable authority" (defendants' own words purporting to describe Relator's pleadings) that Relator cannot

ground an FCA case on "securities laws."  Nothing in the securities laws make them off limits for an FCA action.  If defendants use their financial statements to defraud the government into paying money, as they did here, the fraud within the financial statements gives rise to an FCA claim under the plain language of the FCA.

C.

Defendants state that Relator "premised his claims on the ludicrous assertions that the government would not have entered into multi-billion dollar regulatory settlements—or even bailed out AIG to stave off global financial ruin—had it known of AIG's alleged insuring of Mafia-affiliated businesses *in the 1980s*."  Defendants' Memorandum, at 6 (emphasis added).  Once again, this deliberately mischaracterizes the SAC.  The SAC alleges that Relator learned in prison that through all defendants' efforts, AIG insured Organized Crime-affiliated businesses not only "in the 1980's," but in the 1990's, the 2000's, and indeed up to at least 2010.  SAC, ¶¶ 88-95.  As discussed below in section II of this memorandum and in Relator's declaration attached as an exhibit to this response, Relator learned these facts through detailed conversations with high-level Organized Crime members in federal prison.

Defendants laugh off the concept that the government would not have entered into settlements or bailed out AIG had it known of its deep-rooted connection to Organized Crime, but this is not for them, or the Court, to decide as a matter of law.  Grave though the country's financial condition might have been in 2008, the government might well have refused to bail out AIG (or might well have taken AIG over instead of bailing it out) had it known that AIG underwrote the activities of some of the largest and most dangerous criminal enterprises in the world.  This issue is for a jury to decide, not for a judge to dismiss under Rule 12.

D.

Defendants assert that Relator "disregarded basic time bars by attempting to gin up supposedly perpetual violations of the FCA and securities laws based on decades-old misconduct." Defendants' Memorandum, at 6. A judge in this district, as well as other well-respected jurists, have held that the FCA's ten-year limitation period, 31 U.S.C. § 3731(b)(2), applies to individuals such as Relator. *U.S. ex rel. Wood v. Allergan*, -- F. Supp. 3d --, 2017 WL 1233991, *17-18 (S.D.N.Y. 3/31/17) (citing *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1216 (9th Cir. 1996); *accord United States ex rel. Malloy v. Telephonics Corp.*, 68 Fed. Appx. 270, 272–73 (3d Cir. 2003); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 474 F.Supp.2d 75, 85 (D.D.C. 2007)). Several other decisions not cited in *Allergan* stand for the same principle. *See United States ex rel. Saaf v. Lehman Bros.,* 123 F.3d 1307 (9th Cir.1997); *U.S. ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Actavis Mid Atlantic LLC,* 659 F.Supp. 2d 262, 273-74 (D. Mass. 2009); *United States ex rel. Lewis v. Walker,* 2007 WL 2713018 (M.D.Ga. Sept. 14, 2007); *United States ex rel. Colunga v. Hercules Inc.,* 1998 WL 310481 (D. Utah 1998).

False Claim 2, the 2008 TARP payout, clearly took place within the ten year statute of limitations. The government suffered harm in 2008, thus triggering the limitation period in 2008, by making TARP payments based on AIG's assertion that its 2006 year-end financials were true and correct.

False Claim 3, the government's conversion of stock under the Recapitalization Plan, is timely either under the FCA's six year limitation, 31 U.S.C. § 3731(b)(1), or the ten year limitation period within 31 U.S.C. § 3731(b)(2), since it took place in 2011, within six years before the SAC.

False Claim 1, the 2006 settlement, is timely under the ten year limitation period in 31 U.S.C. § 3731(b)(2), since AIG concealed its frauds during the three year compliance period that ended in 2009.

None of these claims "gin up decades-old misconduct." All of these claims rest upon AIG's underwriting insurance for Organized Crime-controlled companies in the 1980's, 1990's, and 2000's, and deceptive accounting practices designed to conceal its fraud.

### E.

Not only do defendants' attacks on the legal underpinnings of the SAC fail to establish a Rule 11 violation, but they also do not defeat Relator's case under Rule 12. Relator has this day filed an appeal to the Second Circuit Court of Appeals, where he will demonstrate that the legal contentions in the SAC are sufficient to withstand defendants' motions to dismiss.

## II.   Relator had ample factual basis for bringing this action.

According to defendants,

> Pelullo's factual contentions—which concerned a far-ranging alleged conspiracy to insure Mafia-controlled businesses, involving defendants and various organized crime families—were . . . frivolous. The SAC alleged a connection between the Mafia and defendants only on "information and belief." See SAC ¶¶ 89-95. And when defendants challenged these allegations in their motions to dismiss, Pelullo responded by broadly attributing his defamatory contentions to jailhouse conversations with anonymous inmates.

Defendants' Memorandum, at 6-7.

Relator had (and has) ample factual basis to bring this action. Attached to this response is Relator's declaration, which demonstrates in detail his contact in prison with high-ranking members of the Colombo, Bonnano, Genovese, Gambino and Lucchese families, particularly (1) John Carneglia, a "captain" in the Gambino family, (2) Pasquale "Scop" DeLuca, a 50 year member of the Genovese family, and (3) Mario Garafola, who explained the details of JBL

9

Trinity's ("JBL") relationship with AIG.  Exhibit 1, Declaration, at 10-15.  JBL was one of the insurance brokers that obtained insurance from AIG for several Organized Crime-controlled construction and service companies.  In addition, Relator's declaration demonstrates the factual basis for the SAC's assertion that defendant Maurice Greenberg, AIG's former CEO, utilized his wife's cousin, defendant Mel Harris, to (1) acquire and control businesses, such as the Fischbach Corporation, and then camouflage its underwriting losses in SEC filings, and (2) underwrite hundreds of millions of dollars in insurance to companies controlled by Organized Crime.  Declaration, at 3-10, 13, 15.

Relator's declaration thus demonstrates the falsity of defendants' claim that the SAC's claims rest upon jailhouse conversations with "anonymous inmates."

During Rule 12 proceedings, neither defendants nor the Court can brush aside the SAC's allegations as fantasy during Rule 12 proceedings; all allegations in the SAC must be accepted as true.  Nevertheless, both defendants and the Court ridiculed the allegations as fantasy.  Relator's declaration demonstrates that the SAC's allegations rest on facts that he learned through communications with multiple Organized Crime members.  Stated in terms of Rule 11, the "factual contentions" in the SAC "have evidentiary support."  Fed.R.Civ.P. 11(b)(3).  Not only does this defeat defendants' Rule 11 motion, but it demonstrates that dismissal of the SAC was unwarranted under Rule 12.

### III.   Defendants fail to present any support for their request for sanctions.

It is standard practice for parties to support Rule 11 motions with (1) timesheets that describe, with specificity, the amount of time litigating the matter and (2) affidavits or declarations that demonstrate the proper hourly rate(s) for the attorney(s) handling the case.

Since defendants did not provide any such evidence, their motion for sanctions is fatally defective.

Under Rule 11, the determination of an hourly rate requires the Court to decide what a reasonable client would pay for services of the type at issue in the geographic area in question. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 190–92 (2d Cir.2008).  This requires a court to approximate "the market rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998).  This determination should rest on rates from prior cases in the judicial district, attorney affidavits, and the court's own experience with billing rates.  *See Farbotko v. Clinton County of New York,* 433 F.3d 204, 209 (2d Cir.2005).  Further, the Court must analyze whether the hours in the attorneys' bills are "overstated and therefore unreasonable."  *See SEC v. Smith*, 798 F.Supp.2d 412, 440 (S.D.N.Y. 2011) (bills were unreasonable because four attorneys worked on matter when only two were necessary, and number of hours charged was excessive).

Instead of providing the Court with evidence of the proper market rate and bills reflecting the hours expended on this case, defendants merely ask that the Court impose an unspecified amount of sanctions.  Asking the Court to pick a number out of mid-air is improper under Rule 11 and Local Rule 6.1, which requires defendants to file "supporting affidavits" in their motion.  It is also prejudicial to respondents, because the absence of timesheets and affidavits deprives respondents of the opportunity to object to specific time entries and specific claims of prevailing market rates.  It also is inequitable: how can defendants accuse respondents of frivolity when they themselves ignore basic Rule 11 procedures?  It is no solution for defendants to correct these glaring defects in their reply brief, since basic motion practice require defendants to fulfill

11

their duties in their opening memorandum.  Moreover, respondents will suffer prejudice if defendants submit bills and/or affidavits in their reply brief, because the local rules do not authorize them to file a surreply brief.  *See* Local Rule 6.1.  Finally, even if there were a Rule 11 violation—and there certainly is none here—the district court has the discretion to refrain from imposing sanctions.  *Ipcon Collections LLC v. Costco Wholesale Corp.,* 698 F.3d 58, 63 (2d Cir.2012).

      For these reasons, respondents respectfully request that the Court deny defendants' motion for sanctions under Rule 11.

      Respectfully submitted:

      ___/s/ Joseph M. Fioravanti_____
      Joseph M. Fioravanti, Esquire
      Attorney for Relator